IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| Gerald L. Downs and Judy B. Downs, | ) | C/A NO. 0:06-2204-CMC |
| | ) | |
| Plaintiffs, | ) | |
| | ) | **OPINION and ORDER** |
| v. | ) | **GRANTING, IN PART,** |
| | ) | **MOTION FOR SUMMARY JUDGMENT** |
| FRS, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

This matter is before the court on Defendant's motion for summary judgment as to all claims and counterclaims. For the reasons below, the court **grants** Defendant's motion to the extent it seeks summary judgment on Plaintiffs' claims. The court **denies** the motion to the extent it seeks summary judgment on Defendant's counterclaims.

**BACKGROUND**

This action arises out of mold remediation work performed by Defendant, FRS, Inc. ("FRS") on a home owned by Plaintiffs, Gerald L. and Judy B. Downs (Plaintiffs or the "Downses").[1] The work at issue was performed on the guest wing of the home pursuant to a written protocol prepared by a microbiology specialist, Dr. Bruce Lantrip. FRS was hired to perform the work based on the recommendation of the insurance adjuster or other representative of the insurance company. The mold remediation work was paid for by Plaintiffs' insurance company.

Mrs. Downs denies that she signed a contract for FRS's work in the guest wing but does not dispute that she requested that the work be done. For present purposes, the court assumes that

---

[1] Defendant's remediation duties were limited to removal of mold and mold-contaminated or moisture-damaged materials. There is no evidence that Defendant was obligated to repair or replace any materials which it removed or to repair the cause of the moisture intrusion.

Plaintiffs did not sign any contract but agreed to the hiring of FRS with the understanding that its work would be paid for by the insurance company. The court also assumes that Plaintiffs did not understand the scope of the work to be performed, despite the existence of a written protocol.

Plaintiffs seek recovery under various legal theories for damages allegedly caused by FRS's failure to properly perform the remediation in the guest wing, including actions which allegedly caused severe water damage in the separate master wing of the house. In addition, they seek recovery for torts allegedly committed by FRS and its workers while on the premises.

More detailed factual allegations, supporting evidence (or the lack thereof), and the various legal theories are discussed below in the order addressed in Plaintiffs' memorandum in opposition to summary judgment.

## STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party

lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 62 (4th Cir. 1995).

## DISCUSSION

### I.    BREACH OF CONTRACT CLAIM

Plaintiffs' breach of contract claim is premised on FRS's alleged failure to fulfill its contractual obligations. Most particularly, they rely on FRS's alleged failure to "[p]reserve the house's architecture and structural integrity." This requirement is set out in the protocol prepared by Dr. Lantrip which defined the scope of FRS's duties. Pltf Ex. A at 3.[2] In addition, Plaintiffs allege that FRS breached its contract by damaging or removing items of personal property. This claim overlaps with the claim for conversion. Finally, Plaintiffs allege that FRS breached its contract through "an interrelated, foreseeable series of events starting with a cut hot water line and culminating in the flooding of the Master-Suite Wing of [Plaintiffs'] house." These three categories of allegation are discussed, in sequence, below.

---

[2] Plaintiffs rely solely on Dr. Lantrip's protocol and letters to establish the scope of Defendant's contractual obligations. No other evidence of applicable standards is offered.

**A. Breach of duty to preserve architecture and structural integrity.**

Plaintiffs allege that FRS breached its duty to preserve the home's "architecture and structural integrity" by cutting a hole in the roof and putting a thirty-three gallon trash can under that hole which overflowed when full. They also allege that FRS violated this provision by removing bathroom cabinets, and pulling up flooring which left a hole which exposed the house to further mold damage.

The protocol, however, required the remediation contractor (FRS) to "use [its] professional judgment to: • Determine the ultimate extent and method of material removal based on current environmental conditions and previous sampling and inspection results." Pltf Ex. A at 3. The protocol also expressly envisioned that wall-board would be removed as it was required to "be removed to a distance of 18 inches beyond the end of damage or visible microbial growth." *Id.*

FRS has presented a detailed affidavit explaining what work was done and why. Affid. of Dean Barry. Barry explains that, in performing its work, FRS removed contaminated building materials including fallen ceiling materials and mold infested materials. Barry Affid. ¶ 41. He also explains that the "massive" extent of contamination required FRS to "remove a great deal of the second floor's ceiling" and that FRS employees located "hidden mold in the attic" requiring further work. *Id.* ¶ 42. Barry notes that roof repairs, which were supposed to be completed by the homeowners before FRS began its work, either were not done or were not adequately done. *Id.* ¶¶ 44-45. He denies that FRS punched any hole in Plaintiffs' roof. *Id.* ¶ 80. He does not deny that a trash can was placed to catch water dripping from the inadequately repaired roof.

On his first post-remediation inspection, Dr. Lantrip found some remaining mold and recommended further remediation. Barry Affid. Ex. G (Dr. Lantrip's September 13, 2003 report).

4

In this report, Dr. Lantrip notes that his "visual inspection of the residence showed a well-cleaned area" with "[n]o visible fungal growth[.]" *Id.* Air and surface wipe samples, however, found some low levels of mold spores leading to further recommendations. Dr. Lantrip included a notation that it was "imperative that the homeowner repair any damage to the roof or the conditions of fungal amplification will re-establish." *Id.*[3]

Dr. Lantrip found the remediation to have been successfully completed when he performed his second inspection. Barry Affid. Ex. I (Dr. Lantrip's November 12, 2003 report). In this report, Dr. Lantrip noted that the "work area ha[d] been acceptably remediated." *Id.* at 2. He noted, however, that the "open floor provides a potential conduit for the introduction of fungal spores into the residence" and that the floors "should be repaired to obviate concern over transfer of air between the crawlspace and the residence interior." *Id.* He again noted that the "hole in the roof should be repaired and the trash can removed." He does not indicate observing any water overflow from the trash can or damage from the same. Neither does anything in his report or elsewhere suggest that the noted concerns related to any failure by FRS to properly and completely perform its work. They are, instead, directives as to what must be done by others to insure the area is not reinfested with mold.

Plaintiffs attempt to counter the above testimony by relying on several rather rambling excerpts from Mrs. Downs' deposition which, in general, are non-responsive to the question asked and, in any event, do not provide direct support for Plaintiffs' position. For example, when asked whether she had "any reason to believe that FRS did not remove all of the mold and mold-damaged

---

[3] This last statement and all other evidence is consistent with FRS's position that the duty to repair the roof rested with Plaintiffs.

5

material from [the] home." Mrs. Downs responded: "Well how could they? How could they remove it when they cut a hole in my roof and they set a trash can under that hole and they let that trash can overfill and flood my floors . . . ?" Downs depos. at 72. Even accepting these queries as an affirmative statement that FRS *did* cut a hole in Plaintiffs' roof, it is a statement without foundation because Mrs. Downs conceded that she was excluded from that area of the home during the period when any hole would have been cut.[4] It is, moreover, contrary to the statements of fact contained in Dean Barry's affidavit, offered on behalf of FRS, that FRS "did not punch holes in the Downs' roof." Barry affid. ¶ 80. *See also id.* ¶11 (stating that on his initial visit he observed "several sources of water intrusion at [Plaintiffs'] home, including leaking roof seams [and] leaking from a roof-top air conditioning unit").[5]

---

[4] Mrs. Downs testified that when FRS began its work, there was "no hole in the *ceiling*." Downs depos. at 78. She conceded, however, that she was aware that water was coming in from the roof at some point prior to FRS's arrival and no one had gone into the attic to check before FRS arrived. *Id.* at 82. She also conceded that she was advised by someone that water was coming in through seams in the roof. *Id.* She then indicated an assumption that FRS *may* have discovered a rotten area in the roof decking, cut it out, and failed to replace the cut-out area with a piece of wood which, she believes, would have been the proper course. *Id.* This testimony presumes but never expressly states that a hole was cut in the roof and that this (at least) occurred during the time FRS had control of the area, presumably supporting an inference that FRS cut a hole. In short, the claim that FRS cut any hole in the roof is contrary to affirmative evidence that they did not, and, at most, is supported by Mrs. Downs' statement, contained in a query, which lacks any apparent foundation.

[5] Dr. Lantrip noted the existence of a roof leak in his June 19, 2003 letter, which was prepared following his initial visit to Plaintiffs' home and, therefore, before FRS was hired. After his initial post-remediation inspection, he noted that it was "imperative that the *homeowner* repair any damage to the roof or the conditions of fungal amplification will reestablish." Lantrip September 13, 2003 letter at 2 (emphasis added). In his November 12, 2003 report, Dr. Lantrip noted "that the hole in the roof ha[d] not been repaired and that the large trash can was still in place to catch water that entered through the hole." Collectively, these suggest that there was at least a leak predating FRS's work and that a leak or hole existed at the conclusion of the work, but not that FRS caused the leak to worsen or put a hole in the roof. To the extent there is any suggestion as to who was responsible for repair of the leak or hole, Lantrip places this responsibility on the homeowners. Therefore, nothing in this letter supports an inference either that FRS caused the leak or hole or had any duty to repair either.

Similarly, although Mrs. Downs suggests that the trash can was allowed to overflow, she never states when or if she personally observed water overflowing from the trash can. Neither does she provide other direct evidence that water ever did overflow from the trash can or, more critically, that such an overflow occurred during the time FRS was in control of the area and caused at least some damage.[6]

Mrs. Downs' testimony relating to FRS's work also suggests a complete lack of understanding of the requirements of the protocol. For example, she was clearly surprised by FRS's removal of drywall and other building materials, despite the fact that such removal was required by the protocol. *Compare* Downs depos. at 72-73 with Pltf Ex. A at 3. *See also* Downs depos at 63 ("I really did not expect for them to come in, tell us we couldn't go over there, and basically start taking chain saws and axes or whatever it was he used and totally demolish my house. I really didn't think that they were going to do that. I thought that they came to fix the house, not tear it up."). She also suggests that FRS acted improperly in excluding her from the work area, despite the protocol's requirement that the area be sealed off. *Id.*

Plaintiffs have directed the court to nothing in the protocol or any other contractual document which would support imposing a duty on FRS to repair the roof or repair and replace

---

[6] Mrs. Downs concedes that the first time she saw the trash can was after she experienced a flood in the other (master) wing of the house. Mrs. Downs depos. at 85. She claims that she told FRS employees to "[g]et out of my house," that same day, due to the flooding in the master wing and their emergency remediation efforts relating to that flood which she believed to be excessive and inappropriate. While she concedes that she allowed them to leave their drying equipment in the master wing, her claim that she otherwise kicked them out as well as her admission of learning of the trash can's use to catch water on that date are inconsistent with any claim that any later water overflow was FRS's fault. In any event, she does not testify that she saw water overflowing from the trash can on this or any other day or that she observed any damage from any overflow. Downs depos at 85-86.

7

wallboard or other building materials which it removed as part of the remediation.[7] Instead, its duties appear to be limited to cleaning, or where that was not possible, removal of mold damaged materials. Neither has Plaintiff presented any evidence that FRS violated some duty of care or other standard in its exercise of "professional judgment" as to the extent of building materials which needed to be removed.[8]

This aspect of Plaintiffs' breach of contract claim, therefore, amounts to nothing more than speculation that FRS violated the terms of the contract or some implied standard of care. In numerous respects, this speculation (including as to the cause of any leak) is contradicted by direct evidence such as Mr. Barry's affidavit and Dr. Lantrip's reports. Plaintiffs' concerns also appear to derive from a misunderstanding of the nature of the work to be done and apparent disbelief as to

---

[7] The protocol states: "Sources of water leaks should be repaired and verified before final cleaning is conducted or new materials are installed." It does not say to whom these duties were assigned. In any event, there is no evidence that FRS was responsible for making either category of repair and FRS denies that it had such a responsibility. *See* Barry affid. ¶¶ 23-24 ("In general, before FRS can begin a mold remediation project, the site owner must fix or eliminate the sources of water intrusion. . . . FRS's scope of work does not include fixing sources of water intrusion."); *id.* ¶¶ 42-44 (explaining that, after removing damaged portions of the second floor ceiling, FRS employees "discovered a massive amount of hidden mold in the attic" and that the "roof leak, which [FRS had been] led to believe had been repaired, had not been repaired, and . . . the air-conditioning unit servicing the master-suite side of the house was continuing to leak into our containment area."). *See also* Ludlow Report and letters discussed *supra* n. 5.

[8] Even assuming FRS did cut a hole in the roof and place a trash can under it to catch run off, there is no evidence that such an action would have been an improper exercise of FRS's professional judgment under the circumstances. Those circumstances included the presence of one or more continuing sources of water intrusion through the roof into the remediation area. FRS discovered these leaks after having begun its remediation work, which work was commenced based on a representation that Plaintiffs had repaired the roof leaks. Barry affid. ¶¶ 30 &44-47. As noted in the text, there is no evidence that FRS allowed the trash can to overflow during any time it was in control of the area. Neither is there any evidence of damage resulting from any overflow.

8

the scope of the hidden contamination. There is, however, no evidence that FRS failed to perform its contractual duties.

### B.     Breach through damage or conversion of personal property

Plaintiffs assert that FRS employees "either took or damaged several valuable items of personal property." Pltf memo in oppos. at 3. Conceding that FRS had a duty to remove and clean items, Plaintiffs, nonetheless, assert that FRS breached its duty because not all items were returned. In support of this claim, Plaintiffs cite to an interrogatory response in which they listed items which are described in the memorandum as *either* not returned or damaged. The interrogatory answer itself indicates the items were removed and not returned. Even assuming this response could be treated as a prediction of admissible evidence,[9] it is insufficient to support the necessary additional proof requirements that the items *should* have been returned, that is, that Plaintiffs did not agree to their destruction or destruction was not required to complete the remediation work.[10]

Plaintiffs also assert, based on Mrs. Downs' deposition testimony, that "she had to throw away all clothes that were returned because of the smell." *Id.* at 4 (citing Downs depos. at 128). This allegation does not support a claim that property was damaged, destroyed, or not returned by FRS. At most, it is a claim that the cleaning was not successful and that Mrs. Downs determined

---

[9] Only one page of the interrogatory response is provided. The court cannot discern from this page whether the responses were verified. Thus, these responses are not presented in a form which would allow them to be treated as evidence.

[10] The latter point is particularly true as to a claim that cabinets, tile and fixtures were removed from a bathroom. Destruction of at least some of these items may have been the natural result of the remediation effort.

9

that further cleaning efforts would likely not be successful or were otherwise not warranted. Nothing in even this recharacterized claim suggests a breach of contract by FRS.[11]

### C.     Breach relating to flooding of master suite wing of home.

It is undisputed that, at some point, an FRS employee cut a hot water line and flooding of the master wing occurred at some point thereafter.  It is also undisputed that the actual flood resulted when water which had been off came back on causing a tub in the master suite to overflow because it had been left plugged with the taps open.

Beyond this, there is much that is in dispute.  Nonetheless, for present purposes, the court assumes without deciding that there is sufficient evidence from which a jury could find that FRS not only cut a hot water line, but that related events (somehow attributable to FRS) caused a lengthy water outage at the home (lasting for over a week).[12]  The court also assumes that the water,

---

[11] Had Mrs. Downs consulted with FRS prior to disposing of the clothes, it might have arranged a second cleaning.  That option was, however, eliminated by her unilateral decision to dispose of the clothes.  Alternatively, FRS may have agreed with Mrs. Downs that the smell could never be completely removed.  If so, agreement might have been reached that disposal was the proper course, in which case what Mrs. Downs did without consulting is what would have occurred with consultation.  In any event, the court cannot envision a basis on which to hold FRS responsible for breach of contract, conversion, or any other wrongful action based on Mrs. Downs' decision to dispose of her clothing.

[12] There are significant factual disputes relating to what happened after the water line was broken.  FRS has presented evidence through Mr. Barry's affidavit that the cut line was a small hot water line which was repaired the same day (first with tape and then by a plumber) and which did not, at any point, involve FRS cutting off the water to the house.  Barry also avers that Plaintiffs were experiencing unrelated problems with their water supply which were ultimately determined to be attributable to electrical problems at the pump.
   Mrs. Downs, by contrast, claims that the broken line led directly to a water outage that lasted for over a week.  Downs depos. at 90.  She further asserts that: "They [meaning FRS] just said the problem was with getting the water back on to the house, they had broke the valve at the well. When they cut off the well, they had broke the valve . . . and that they were going to have to get a plumber to come out and repair that."  Downs depos. at 90.  *See also id.* at 91 (confirming that Barry stated that FRS broke the valve on the pump).  This testimony is somewhat contradicted by her own testimony that the problem with the well involved a defective breaker, rather than a defective valve. *See id.* at 103.

10

ultimately, came back on while Mrs. Downs was absent from her home and at a time when FRS employees had access to the home.

Plaintiffs' theory is that, after causing the outage in the first place, "someone from FRS [cut] the water back on without checking the faucets to make sure that nothing was on." Pltf memo in oppos. at 4. Plaintiffs do not, however, direct the court to any evidence which would support the *factual* conclusion that FRS did something to cause the water to come on that day or, in fact, had employees present when the water did come on.[13] Neither do Plaintiffs offer any factual or legal support for imposing a duty on FRS, assuming it did cut on the water, to first check the owner's master suite, where it was not performing work, to insure that the owners had not left faucets open and tubs plugged. Thus, Plaintiffs have failed to present evidence from which a reasonable jury could find FRS responsible for the flooding of the master suite wing.[14]

---

[13] FRS has presented evidence that one of its employees reported finding the flood when he arrived for work. Mrs. Downs, on the other hand, appears to have assumed that FRS was present because she was not. *See* Downs depos. at 103 (quoted below). She, likewise, assumed the water would not have come on without action by *someone*. *Id.* Nonetheless, despite stating an assumption that no one but FRS would have been present, she also indicated a belief that a plumber or electrician could have been present:

> Now, I imagine they had to have a plumber out here when they did that. I mean, that would be my opinion, because somebody had to turn the water on. Now, if it came on when they got the breaker back on, maybe they didn't know the water was coming back on when they fixed the breaker at the well. I don't know. I mean, I can't understand why they wouldn't think that the water would come back on. If the problem was at the well and that flooded the house, that could have been. But [FRS] was here when they flooded the house, not me, not anybody else.

*Id.*

[14] Plaintiffs cite to various contradictions between events as recalled by Mrs. Downs and by Dean Barry, as well as to alleged inconsistencies between Barry's version of events and contemporaneous notes which he or others made. None of the alleged inconsistencies, however, directly relates to the critical issues discussed in the text: whether anyone from FRS caused the water

11

For the reasons set forth above, it is apparent that despite the numerous disputed facts, there are no *genuine issues of material fact*, and Defendant is entitled to judgment as a matter of law on all aspects of the contract claim.

**II.     BREACH OF CONTRACT ACCOMPANIED BY A FRAUDULENT ACT.**

Plaintiffs allege that FRS allowed its employees to take "valuable personal property . . . claiming it was damaged by mold" and also that FRS "covered up that [its] employee . . . cut on the water without checking the faucets." Based on these assertions, Plaintiffs assert any breach of contract was committed with fraudulent intent and accompanied by a fraudulent act.

The failure of the breach of contract claim necessarily defeats recovery for breach of contract accompanied by a fraudulent act. Further, no prediction of admissible evidence has been offered which would support either of the alleged fraudulent acts. For both reasons, this "claim" (technically just a basis for enhanced (punitive) damages for the breach of contract claim) fails as a matter of law.

**III.    CONVERSION CLAIM**

The conversion claim fails for the same reasons referenced above regarding the similar allegations under the contract claim. That is, Plaintiffs have failed to present a prediction of admissible evidence sufficient to establish that FRS made an "unauthorized assumption and exercise of the right of ownership over goods or personal chattels belonging to" Plaintiffs. *Crane v. Citicorp Nat'l Servs., Inc.,* 437 S.E.2d 50, 52 (S.C. 1993) (superceded by statute as to unrelated ruling).

---

to come on, and whether FRS had any duty to check for open faucets and plugged drains if it did cause the water to come on.

12

**IV.     UNFAIR TRADE PRACTICES ACT CLAIM**

Plaintiffs' argue that their South Carolina Unfair Trade Practices Act claim should survive because: "A jury could find that FRS committed unfair and deceptive acts by taking [Plaintiffs'] personal property by claiming it was mold infested and by covering up for an employee who turned on the water without checking the faucets." This is a slight recasting of the conversion, breach of contract, and fraudulent act allegations. The recasting is not, however, sufficient to save the claim as there is no evidence to support an inference that: (1) FRS falsely claimed that any property was mold invested (in order to gain or retain possession of that property); or (2) that an FRS employee turned on the water, much less that this fact was concealed or that such concealment caused injury. In addition, there is no prediction of evidence to support the public impact element.

**V.      BREACH OF IMPLIED WARRANTY OF WORKMANSHIP**

This claim fails for the same reason as the breach of contract claim. Plaintiffs have presented no evidence from which a jury could find that FRS's work was not in conformity with any applicable standards, whether derived from the protocol or some industry standard.

**VI.     COUNTERCLAIMS**

FRS's counterclaims are based on allegations that: it performed work to clean up damage caused by flooding in the master suite wing; Mrs. Downs agreed for this work to be done; and FRS has not been paid for the work. FRS bears the burden of proof as to these counterclaims which are based on both a contract and an unjust enrichment theory.

Mrs. Downs concedes that FRS did work for the stated purpose and that she "allowed" FRS to leave drying equipment in the area. She denies, however, that she agreed to pay for any work done. Plaintiffs also challenge whether any work done was gratuitous and the value of any benefit.

*See Niggell Assoc., Inc., v. Polo's of N. Myrtle Beach, Inc.,* 374 S.E.2d 507, 509 (S.C. App. 1988) (listing elements of unjust enrichment claim).

While there is certainly evidence which may support FRS's counterclaims, the record is not so clear as to require judgment in FRS's favor under either a contract or unjust enrichment theory. FRS's motion for summary judgment on its counterclaims is, therefore, denied.

## CONCLUSION

For the reasons set forth above, the court grants FRS's motion for summary judgment as to all claims asserted against it but denies FRS's motion for summary judgment as to the counterclaim. The counterclaim shall proceed to trial with the following modifications of the Fourth Amended Scheduling Order (Dkt No. 35):

Rule 26(a)(3) Disclosures due by November 1, 2007;

Motions in Limine due by December 7, 2007;

Jury Selection set for January 11, 2008;

All other deadlines remain as set forth in the Fourth Amended Scheduling Order (¶¶ 8-11).

IT IS SO ORDERED.

       s/ Cameron McGowan Currie
       CAMERON MCGOWAN CURRIE
       UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
October 16, 2007

C:\Documents and Settings\Glp59\Local Settings\Temp\notesE1EF34\06-2204 Downs v FRS grant partial sj.wpd